Case No. 17-1122 at Elm, International Union of Operating Engineers, Local 18, Petitioner v. National Labor Relations Board. Mr. Fallot for the petitioner, Ms. Beard for the respondent, and Ms. Hsu for the intervenors. Good morning, Your Honor. Thank you. May it please the Court. Timothy Ronald Fidel on behalf of the petitioner, cross-respondent, International Union of Operating Engineers. With leave of the Court, we respectfully request five minutes of rebuttal time. Collective bargaining is an attempt to erect a system of self-government utilizing agreed-upon rules which seek to avoid leaving matters subject to a temporary resolution dependent solely upon the relative strength at any given time of the contending forces. It has therefore long been federal policy to promote the use of collective bargaining as a way to ensure industrial stability and peace. It has also long been federal policy to encourage the use of the grievance and arbitration procedure as a process to resolve any disputes arising under the collective bargaining process. The policy favoring collective bargaining and the policy favoring arbitration of disputes arising in a labor setting under a collective bargaining agreement is no less applicable in cases where the dispute between the parties is a jurisdictional dispute. Indeed, the legislative history of Section 10K of the Act, which was created to address jurisdictional disputes, demonstrates that Congress, when it passed that Act, intended that it would spur the parties, the employers, the unions, to take it upon themselves, amongst themselves, to create a system of governance that would potentially avoid the need for the board to invoke its authority under Section 10K and resolve a jurisdictional dispute. The congressional intent to allow the parties to collectively bargain in a way to avoid jurisdictional disputes was wholeheartedly adopted by the parties in this case. For decades, Local 18 has engaged in a collective bargaining process with the employers at issue in this case through their representatives to create a collective bargaining system that is designed to avoid any possibility or semblance of jurisdictional disputes, and the collective bargaining relationship does so in several significant ways. First and foremost, the collective bargaining agreements that were negotiated by these parties specifically identify the type of work that belongs to the operating engineers, and the employers specifically, in entering into that collective bargaining agreement, specifically acknowledge what work is properly within the union's jurisdiction. That work for decades has included forklift and skid steer work. In addition to specifying the work that should be assigned to the operating engineers under the collective bargaining agreement, the collective bargaining agreement itself also provides a mechanism in case there is any dispute or misassignment of that work. Specifically, the collective bargaining agreement envisions a scenario where the employer may elect to assign work specifically identified in that collective bargaining agreement to somebody other than an operating engineer. In those circumstances, a collective bargaining agreement limits Local 18 in not seeking an assignment of that work. Instead, Local 18 is limited to seeking only damages that are directly attributable to that misassignment of work. And for years, when there were disputes about the assignment of forklifts and skid steers, that dispute was resolved in that manner, through the filing of a grievance and, if necessary, the arbitration of that grievance. In this case, the underlying facts relied upon by the board to resolve this case, as found by the ALJ, acknowledge that, and acknowledge that over the relevant period of time that the ALJ examined, there were no fewer than 13 settled grievances where the operating engineers, Local 18, documented an instance where a piece of equipment was assigned specifically a forklift or a skid steer to somebody else, and the employer agreed not to invoke 10-K, but to honor the mandates of the collective bargaining agreement, and, in fact, pay the damages as called for by the collective bargaining agreement. This long-established practice that a peaceful resolve these jurisdictional disputes for decades was rendered asunder when the employers took it upon themselves to avoid their obligations by engaging in essentially collusion with a third party, a outside labor organization, intended to ensure that they could reassign this work away without having to pay the damages, and they would do so by invoking Section 8B4, or Section 10-K of the Act, and subsequently 8B4-D of the Act. And when they did so, when they attempted, and in that vein, this dispute does not arise from a misassignment of work. This dispute, why we are here today, is not because there is an employer that elected to assign work out of a bargaining unit. The dispute is the employer's refusal to honor and obey or honor and adhere to the terms and conditions of the damages clause in the collective bargaining agreement which specify damages. The assignment is not what the union is after, merely its damages. And for decades there was free and fair collective bargaining agreement between these parties that specifically calls for damages. And to the extent that the Board has invoked its Section 10-K authority and subsequent authority under 8B4-D of the Act to render Local 18's grievances seeking damages an improper violation of its assignment of work under the 10-K, that does harm to the fundamental purpose of the National Labor Relations Act, which is to encourage collective bargaining and the use of the grievance and arbitration procedure. And that damage and that violence to the National Labor Relations Act's fundamental purpose is further exacerbated in this case when there is clearly a way to honor both, where the Section 10-K's mandates of resolving jurisdictional disputes can still be honored and the assignment that the Board awarded can still be honored, as can the deference that needs to be paid to the party's decision to collectively bargain for a liquidated damages clause. In this case, that would simply go by the employers continuing to assign the work as they see fit while simultaneously paying damages in those instances where grievance was brought and damages were asserted and deemed to be justified or necessary. So, to the extent that this Board's ruling has invaded and done harm to the fundamental purpose of the Act, the respondent would believe that it needs to be addressed by this Court. This is work that Local 310 had always been doing, right? This is work that Local 18 had always been doing, Your Honor. The collective bargaining agreements that issue in this case... What am I missing in the facts? I thought the laborers had been traditionally doing this work. The testimony offered by the intervening employers was that, in some situation, their claim was that the laborers had always been performing this work. The ALJ did not find that to be the case. Whether you examine whether the work had been performed under a fractured bargaining unit analysis that the Board adopted or the broader bargaining unit analysis that the union asserts is a proper analysis, both will show that this work had, in fact, been performed by Local 18 in the past. As it relates to the specific employers utilizing the fractured bargaining unit analysis adopted by the ALJ and the Board, no fewer than two of the employers in this case, Independence and R.G. Smith, have a history of assigning this type of work specifically to the operating engineers. And that was a fact that was found by the ALJ and a factual finding that was not disturbed by the Board. In the context of the larger multi-employer bargaining unit, the ALJ found, as a matter of fact, that there were hundreds of instances over the relevant time period where Local 18 actually performed the work in dispute. Did the ALJ find that the laborers had done this a lot? The ALJ found that the laborers had, in fact, performed this work as well, yes, Your Honor. There was not, neither Local 18 nor the laborers had an exclusive assignment to this work. My understanding from the record, and again I have to look back on this, was that the essential holding was that the laborers, much more so than the operating engineers, had been doing this work, even though the operating engineers had done some. That essential holding was based upon factual findings, utilizing an analysis where the Board avoided looking to the multi-employer bargaining unit as a whole. You're saying that you agree that it's a factual finding, but you think it's clearly erroneous? I believe that the factual finding was only reached because the Board was able to ignore the hiring. Are you saying the finding was clearly erroneous? I'm saying the finding is not supported by substantial evidence in light of the Board's other findings. But you agree there is this finding? I agree that the Board did make the determination that the laborers had, in fact, performed this work for a limited number of employers, but the employers that the Board made the determination that the laborers performed the work for were limited to the interveners in this case. So essentially the Board made that determination by looking at the only people who were complaining about the laborer of Local 18 requesting this. The collective bargaining agreement that we're talking about between these parties that creates a work preservation defense and that identifies a multi-employer bargaining unit as the appropriate unit. There is no question that that unit involves and includes hundreds of different employers. The ALJ found as much. That being said, Your Honor, when the Board went to analyze whether or not this work was appropriate for a work preservation defense, it looked only to the hiring practices, not to the multi-employer unit as a whole, but to the individual hiring practices of each individual employer. And in so doing was able to effectively make the determination, well, Local 18 never did this work for this individual employer. It ignored what it was required to do by its own general counsel's memorandum to address whether or not that work is fairly claimable in the multi-employer bargaining unit as a whole that was created under that collective bargaining agreement. And with that, I notice— You're into your rebuttal time that you reserved. If you want to—  Go ahead. I'd like to ask one other question. The Board is essentially arguing in this case that you're raising something that has been disposed of. These matters have already been litigated. I believe Your Honor is referring to the Sixth Circuit's opinion? No, I think they're saying that the disputes that you're raising here have been previously resolved by the Board. Your Honor, the only time the Board's— Those disputes were addressed and raised in a Section 10k proceeding underneath. That Section 10k proceeding is not a full and true adjudication of the rights. It's an intermediary step. I think at least on one of them, there was a following ULP proceeding. There was an ALJ proceeding by Judge Karisany. And it was, and their argument is, they've been resolved. They have been resolved, but in resolving it, the Board applied the wrong law. But wait, the question is whether you can re-litigate. The union is not seeking to re-litigate the assignment of work, Your Honor. It is only seeking to re-litigate whether or not its continued pursuit of its grievances in light of that assignment is prohibited under Section 8b40 of the Act. So the assignment of work will stand, unless the employers elect to reopen the hearings based upon changed circumstances, which they are permitted to do. Were you seeking to preserve only the work that this union had previously done? We will seek and preserve the work that the employers have agreed to assign to the operating engineers by voluntarily entering into these collective bargaining agreements that identify that work. So is that a no? We will seek to preserve and protect that work which we have performed within the multi-employer bargaining unit. If we have not performed that work for an individual employer, but have a practice of performing it within the multi-employer bargaining unit as a whole, we would still pursue our claims against the individual employer. That is a deal which they agreed to. And the Board said under the Act there was a dispute here. The employer was getting squeezed by Local 18 and Local 310. That's exactly when the Board can come in for the situation. The employer was being squeezed, and so they want a resolution on it. The employer was being squeezed not by two competing demands for the assignment of the work, which is what 10-K envisions. You weren't demanding the work? We were demanding damages for a failure to assign that work. My understanding was you first said we want the work, and when they said it's the laborers, then you say, well, we're entitled to damages. You just came in and said we'll take damages. That was all that happened to you? That is what the collective bargaining agreement specifically calls for. No, no, that's not my question. That is exactly what happened here. So my understanding of the record is wrong. The union never made a request for the work. Your Honor, the demand for damages is based on a right to the work. That's not my question. Please note this is really important because then I'm completely confused about your theory. Your Honor, my understanding is the union said this is all work. We want our work. It is our work under the collective bargaining agreement. And then when you think you get the wrong answer, then you're saying, well, you have to pay us now. The work has been collectively bargained to be assigned to the operating engineers, and we have pointed out to these employers by filing these grievances that seek damages that by failing to assign it. I'm not answering my question. Didn't you demand the work? By virtue of yes. Yes, Your Honor. We requested the work. Of course you did. Of course you demanded the work. You demanded the work. That's all I'm asking. Yes, Your Honor. Because then that makes it clear to me that the NLR applies and that the board may have a role. Of course you demanded the work. But when another party demanded the work, the local 18 said, we will no longer demand it. We will instead request only damages. And in processing each of his grievances, it utilized what we refer to as Miranda cards, which are specific cards that were handed to the employer at the time the grievance was filed that specifically disclaimed any assignment of the work, and instead pointed out that we were only seeking damages for the misassignment of work. So you're saying if at that point the employer said, okay, you can have it, you would have turned it away? No, at that point we would no longer demand it. We would no longer have a basis to file agreements at that point, Your Honor. There would be no longer any violation of the collective bargaining agreement.  Thank you, Your Honor. Good morning. I'm Heather Beard for the NLRB, and we seek enforcement of the board's order against local 18. So to begin, I agree with my opposing counsel. Congress intended to make Section 10K proceedings the peaceful and binding final determination of work assignments between unions. Here we have two unions competing demands for the same work. And the losing union here, my opponent, here's where I disagree, they cannot continue to flout the board's Section 10K determinations, either by seeking the work, which they are seeking, or by pursuing and filing grievances to get pay in lieu of the work. Both of those have been held by the circuit courts, including, I believe, this court in Sealand, that even seeking damages in lieu of the work is the same, essentially, as requesting the work, in that any sort of distinction is ephemeral, because if an employer is to give damages to one union versus the other union, the statutory provision against threatening or coercing an employer to give work to another labor union is invoked. And so under well-settled case law, under Section 10K and 8B.4.2d, that I do not believe local 18 has even challenged in their opening brief with regard to the distinction, ephemeral as it may be, between seeking work and seeking damages. That was not challenged as something that was legally untoward by the board. So insofar as that is concerned, this is a classic Section 10K determination that the board made. Now, we also agree that the policy, national labor policy, does favor collective bargaining and arbitration. However, Section 10K is not in conflict with this. When you have two unions, as you did here, that have two separate collective bargaining agreements, two competing claims for work, the very reason that this section was introduced was to keep commerce flowing and to keep the employer in business and able to give the work to one of the unions. And in this instance, when there is a Section 10K determination, there are three threshold determinations that the board made. The board made those four different times throughout the course of this dispute, starting the worksite at Donnelly's, then making demands for the work to the entirety of the multi-employer unit, the CEA. Then they made demands to the employer's KMU, 21st Century, and then to Narone. And in all of those instances, the board found the three threshold issues it needed to determine a 10K. There were two competing claims for work. There was a prescribed means of seeking it, which was a strike threat. And here we have two strike threats that were made by the laborers when the employers told them, look, if we assign the work to the other union, you all are not going to get the work. And there was a strike threat that was made. And the board found in not only all four 10K determinations, but in the earlier ULP determination that was sparked after the first two 10Ks in Donnelly's 4, which was enforced by the Sixth Circuit, that there was no evidence presented by the Local 18 of any collusion to create a sham jurisdictional dispute. All of that was rejected by the board four times and a fifth time in an unfair labor practice hearing. And so then we moved to the third threshold finding in a 10K determination, which is no voluntary method for the settlement of the dispute. And this is what I think is really important. My opponent's presentation was we could move on and we can just give the work to one union and pay damages to the other. The problem with that is that there is no voluntary method between all three parties to resolve this dispute. And so once the board makes that finding, those threshold findings, it goes on and gives the laborers or whichever union is, the unions before it, the opportunity to fight it out in front of the board as to who should get the work. And then there's five different merits findings that the board makes as to which union should be assigned the work. And then that is supposed to be it so that we can continue and the employers can continue to get their work done. This case is an example with a lot of complicated potential, lots of facts, but all of them are in the simple classic board 10K 8B4 2D rubric. So the issue here that my opponent has raised throughout the briefs is that they have an affirmative defense, which is their burden to prove that they were merely seeking to preserve their own work. But as my opponent admitted to this court, the board made findings that with regard to all of the employers who were charging parties, not just regarding Donnelly's four with those employers, but here, the charging employers here that the laborers did, as Judge Edward points out, do the majority of that work other than in rare and isolated instances. And those instances were for independents and R.G. Smith. And there was testimony in, exhaustively, the Donnelly's four 10K, or rather 8B4 2D proceeding about those, the work done for these charging party employers. And there was in the following two 10K. They did do work for these employers before, this kind of work. Yes, there were isolated instances where local 18 folks were in the seats of the skid steers Yes, in the forklifts. But what the board found was that Aren't they then seeking to preserve their ability to do that kind of work? Under the board's test for work preservation, no, Your Honor. Under the board's test for work preservation, the employer, rather, the union needs to demonstrate who's making that claim, that they are not trying to acquire new work. And one of the most important factors is whether they've done it exclusively. And here, because the union has not done it exclusively, indeed most of the time for the last 30 years, as local 18 itself admitted, this work has been done by the laborers. And so if there are isolated instances, which the board found in the Shepard case not to be sufficient, that does not preclude a finding that the work is not being preserved because they're trying to grab all of the work at these particular projects. So the union's argument is not even in its brief or its reply brief, if I'm correct, that there's so much work that was done here for these charging party employers that the union is preserving it. Their argument is let's do a test, the fairly claimable test throughout the entirety of the multi-employer unit, and find that dotted throughout there's some instances of local 18 doing the work. The problem with that, that would completely eviscerate Section 10K under the Act because the first threshold finding is whether there are two competing claims. So yes, there are going to be two competing claims here, but when the board goes through the threshold procedures and determines that what's happening is local 18 is trying to take work that it hasn't done for 30 years, it meets the board's class. What if a union's just trying to preserve its share of the work that it previously had? If a union is trying, which would be a different case, that would definitely be a different story because what would be looked to is whether or not they're trying to get more than was just the work that they had performed. So yes, if that was the case, that would be different. But here what's the difference? You're saying that threat for damages under the contract subsumed all of the work, not just the isolated instances that they had done? No. Again, what I'm saying more precisely, Your Honor, thank you for the opportunity to clarify, is that the work that they were seeking under their grievances was work at the individual project sites of the employers that they had not been performing, just at those sites. That's what I was saying, Your Honor. That they had not been performing. Correct. Correct, not that they had not been performing. So the grievance, well, then the answer to my question was, were they seeking grievance damages for work in places where they had not done these? Yes, Your Honor. Yes, Your Honor. And so for those reasons and for all of the reasons in our brief, we would ask that this controversy with regard to who gets the work at these particular job sites be resolved and that the board's order be enforced. What's the thrust of your relitigation point, if any? The thrust of our relitigation point is that with regard to collusion, first, they cannot relitigate the issue of collusion. The board has held in the case standard drywall that collusion being a threshold issue in a 10-K determination is not properly relitigated in AP 42D proceedings. Nonetheless, the board also went ahead and said, even if we're wrong on the relitigation point, the evidence that's been put in throughout all of these cases, and proffered, actually, is not sufficient in any event to demonstrate that there was any prejudice to them by not including it because it wouldn't meet the standard for collusion. Relitigation regarding the work preservation issue is a similar argument we're making, which is the board determines that a threshold issue in a 10-K for which work preservation would be kind of an affirmative defense is done once the 10-K has been completed. Now, in this instance, however, we have the unique situation where the board in Donnelly's 4 did actually let them relitigate work preservation once and bring in evidence. And so our position with regard to relitigation in AP. Was preceding the Donnelly's 4? There were two 10-Ks before Donnelly's 4, and then Donnelly's 4, which was the ULP proceeding, the board did allow in a lot of evidence on the multi-employer bargaining units and who was doing the work, and then determined that the correct test is one that looks to the charging party employers and not to the multi-employer unit. And so our position is they shouldn't now, after having two 10-Ks, a ULP determination, then two more 10-Ks, relitigate the work preservation. So wait, are you saying the Sixth Circuit, affirming the board, takes care of all this? Is that what you're saying? The Sixth Circuit is definitely precedent that the work preservation defense is a defense they must prove as to doing, as to not wanting to acquire work in the charging party employer units at issue. So Donnelly's 4, which was addressed by the Sixth Circuit, found it was appropriate for the board to take a look at work preservation only in terms of the charging party employers. So yes, that was determined in the Sixth Circuit, upholding Donnelly's 4. Okay, thank you very much. We'll hear from the intervener. Good morning, Your Honors. Good morning. May it please the Court, my name is Meredith Shoup. I'm here on behalf of the charging party intervening employers in this case. I think it's worth explaining up front  there was a lot of discussion about whether or not the charging party construction industry employers join multi-employer bargaining units. And those multi-employer associations negotiate contracts with various trade unions. In this case, in relevant part, the Construction Employers Association, for example, negotiated contracts with Laborers Local 310 and Operating Engineers Local 18. Operating Engineers Local 18's jurisdiction spreads throughout the state of Ohio and beyond. I believe it's either every county or almost every county in the state of Ohio. Laborers Local 310's jurisdiction is just a very small subset of the state of Ohio. That's right around Cleveland, Ohio, around Cuyahoga County. The reason I mention this is because we have two collective bargaining agreements with inconsistent obligations on behalf of the employers. That's exactly what Section 10-K was designed to resolve. For employers who found themselves caught in the middle of work jurisdiction disputes between two unions. That's why Section 10-K was introduced into the law. Under these circumstances, employers can, and in this case did, petition the board for a resolution. In order to resolve that issue, the board first looks to whether  and if so, it reviews a number of factors including the employer's past practice, efficiency, safety, the area practice, the industry practice, and the employer's preference. On balance, it then makes a determination as to which union should perform the work. This is basic Section 10-K determination. However, at the Section 10-K hearing, if an employer were to have manufactured a work jurisdiction dispute by, for example, unilaterally reassigning work that had been historically performed by one trade assigning it to another trade, then the union whose members had historically done that work has an affirmative defense that renders a Section 10-K determination inappropriate. This is the true work preservation defense. It can be seen, just for example, in the case like Machinist District 190, which is a 2005 NLRB case. That's the work preservation defense. Here, the operating engineers proposed to turn the work preservation defense into a mechanism to undermine the entire purpose of Section 10-K as applied to employers who are members of these multi-employer bargaining associations. In particular, the operating engineers seek to assert work preservation where the work would otherwise be fairly claimable under Section 8B42B of the National Labor Relations Act. That is the hot cargo provision. I would just like to emphasize that cases under Section 8B42B say that a union can assert financial pressure to prevent employers with whom it has contracts from subcontracting work, for example, to non-union employers, right? That's a different circumstance. Specifically, unions can do that if the work in question is fairly claimable, meaning that it's the work that their members do. In hot cargo cases, the union is applying pressure to encourage the employer to follow a contractual clause. It is not about not contracting work out to, for example, non-union employers. Here, under Section 10-K and Section 8B4D, that standard makes no sense. If an employer has historically assigned work based on a composite crew or has ever had consistencies in work assignment or, as in this case, is just a member of a multi-employer bargaining association where that work is sometimes assigned to the competing union, then both of the unions could assert that the work was fairly claimable, right? Under that analysis, Section 10-K would be rendered useless. It could not resolve work jurisdiction disputes that it was designated to address. And that is why the whole fairly claimable standard simply cannot apply. It puts employers back in the situation they were in before they ever filed a charge. Thank you very much. Thank you. You may have two minutes for a vote. Thank you, Your Honor, and I will be brief. From Local 18's perspective, the instances of its members performing this work for the employers that were part of the multi-employer bargaining unit or just part of the respondents to the board's case were not isolated instances. There were 391 jobs over the course of the years that were lost. As it relates to the specific employers at this issue, the testimony is addressed in Local 18's principal brief about two longtime employees of Independence who, as a result of this dispute, lost their jobs. We're told those who talk don't work. When they complained about no longer being assigned the forklift and skid-steer work, were actually fired. So it's not isolated instances of us performing this work. It is a long and proud history and tradition of performing this work. I would also want to address the idea that exclusivity of performance of the work is a prerequisite to Local 18 asserting its work preservation claim. Exclusivity is not a prerequisite. The cases that the board and that the intervener rely upon to make that claim is Prate Installation v. Carpenters, which was cited by the ALJ, by the board, by the interveners, and by the Sixth Circuit. That case involved was completely an opposite. It involved two unions who had long agreed to form composite crews where both unions agreed that they would intermingle their work and would each perform the work of the others. And there was no dispute for years. What ended up happening is one of those unions decided they were going to claim all the work one day, and that led to the jurisdictional dispute. That's not the case here. It's clear Local 18 has never agreed with the laborers to split this work, nor is Local 18 claiming exclusive jurisdiction over all the work, only those isolated instances where breaches were observed and subject to a grievance and arbitration procedure. Thank you very much. Thank you to all the council. The case is moved.
judges: Kavanaugh, Edwards, Sentelle